UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BETTY MOORE,** | Civ. No. 2:11-05369 (KM) |
| Plaintiff, | |
| | **OPINION** |
| v. | |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | |

**KEVIN MCNULTY, U.S.D.J.:**

    Betty Moore brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final determination by the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons that follow, the Commissioner's decision is **VACATED** and the case is **REMANDED** for further findings.

    **I.    LEGAL STANDARDS**

    **A. The Five-Step Sequential Analysis**

    Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). In the first step, the Commissioner determines whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner moves to step two to determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id*. §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, the Commissioner inquires in step three as to whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A. If so, the claimant is automatically eligible to receive benefits (and the analysis ends); if not, the Commissioner moves on to step four. *Id*. §§ 404.1520(d), 416.920(d). In the fourth step, the Commissioner decides whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to

1

perform past relevant work. *Id.* §§ 404.1520(e)-(f), 416.920(e)-(f). The claimant bears the burden of proof at each of these first four steps. At step five, the burden shifts to the Social Security Administration to demonstrate that the claimant is capable of performing other jobs that exist in significant numbers in the national economy in light of the claimant's age, education, work experience and RFC. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007) (citations omitted).

### B. Standard of Review

For the purpose of this appeal, the Court conducts a plenary review of the legal issues. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). The factual findings of the Administrative Law Judge ("ALJ") are reviewed "only to determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Accord *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "[I]n evaluating whether substantial evidence supports the ALJ's findings . . . leniency should be shown in establishing the claimant's disability, and . . . the Secretary's responsibility to rebut it should be strictly construed. Due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a typical suit in a court of record where the adversary system prevails." *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal citations and quotations omitted). When substantial evidence exists to support the ALJ's factual findings, this Court must abide by the ALJ's determinations. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)).

### II. BACKGROUND

Betty Moore, a 50 year old female, applied for disability benefits under Title II (for DIB) and Title XVI (for SSI) in February 2007, alleging disability beginning on January 1, 2005 due to morbid obesity, sleep apnea, migraine headaches, difficulty breathing, carpal tunnel syndrome, poor circulation, and borderline intellectual functioning. *See* Administrative Record, ECF No. 11 ("AR" or the "Record") at 14, 17. In a September 15, 2009 decision, the ALJ denied Ms. Moore's claim for benefits finding that she retained the capacity to perform her work as a fast food preparer in a fast food restaurant. *See id.* at 22-23. The Appeals Council denied Ms. Moore's appeal in a July 20, 2011 order, *see id.* at 1-5, making the ALJ's decision final and appealable. Ms. Moore filed an appeal in this Court on October 25, 2011. *See* ECF No. 2.

### III. DISCUSSION

In the five-step sequential evaluation process required by the SSA and the Third Circuit, *see Plummer*, 186 F.3d at 428, the ALJ found first that Ms. Moore had not engaged in substantial gainful activity since the alleged onset date of her disability, and second that she has the following severe impairments: morbid obesity, sleep apnea, migraines, breathing difficulty, carpal tunnel syndrome, poor circulation and borderline intellectual functioning. *See* AR at 16-17.

In step three, the ALJ was required to determine whether any of Ms. Moore's impairments, alone or in combination with other impairments, meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 (a "listed impairment"). *See Plummer*, 186 F.3d at 428; *see also* AR at 15. If a claimant is found to have a listed impairment or its equivalent, then she is considered disabled and the inquiry ends. *See id.*

Despite evidence indicating that Ms. Moore's intellectual functioning, alone or in combination with her physical impairments, "meets or is equivalent to a listed impairment," the ALJ nonetheless continued on to step four of the analysis: whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. The ALJ concluded that Ms. Moore "has the residual functional capacity to perform medium work," AR at 19, and accordingly concluded that she is "capable of performing past relevant work as a food preparer in a fast food restaurant." AR at 22.

I disagree. The Record demonstrates that the ALJ failed to properly consider the evidence of Ms. Moore's intellectual disability and severe obesity at step three of the analysis. That procedural flaw is sufficient to require a remand. In addition, I find a strong possibility that, if the ALJ had properly considered this evidence, Ms. Moore would have been found eligible for benefits.

### A. Evidence of Ms. Moore's Severe Obesity and other Physical Impairments

Obesity was removed as a "listed impairment" in 1999, but, as the Third Circuit has recognized, "this did not eliminate obesity as a cause of disability. To the contrary, the Commissioner promulgated [Social Security Ruling] 00–3p, indicating how obesity is to be considered. This SSR replaced an automatic designation of obesity as a Listed Impairment, based on a claimant's height and weight, with an individualized inquiry, focused on the combined effect of obesity and other severe impairments afflicting the claimant." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009) (citing SSR 00-3p, 65 Fed.Reg. 31039, 31040–42 (May 15, 2000)); *see also Webster v. Astrue*, 628 F. Supp. 2d 1028, 1031 (S.D. Iowa 2009) (explaining "This SSR points out that obesity is a

3

life long impairment, and that although the obesity listing was deleted, the impairment requires special consideration in the evaluation of a disability claim," and, on remand, directing "both the ALJ and counsel . . . to read this ruling carefully, and then apply it to the facts of Plaintiff's case").

In 2002, SSR 00-3p was superseded by SSR 02-1p, 67 Fed.Reg. 57859-02 (Sept. 12, 2002), but SSR 02-1p did not materially amend SSR 00-3p. *See Diaz*, 577 F.3d at 503.

SSR 02-1p provides the following guidance:

> [W]e consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.
>
> . . . .
>
> Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. . . . For example, when evaluating impairments under mental disorder listings 12.05C, 112.05D, or 112.05F, obesity that is "severe," . . . satisfies the criteria in listing 12.05C for a physical impairment imposing an additional and significant work-related limitation of function and in listings 112.05D and 112.05F for a physical impairment imposing an additional and significant limitation of function. . . . We may also find that obesity, by itself, is medically equivalent to a listed impairment. . . . We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment.

4

Social Security Ruling, SSR 02-1p; Titles II and XVI: Evaluation of Obesity, 67 FR 57859-02.

In *Diaz*, the Third Circuit, citing SSR 02-1p, confirmed that "an ALJ must meaningfully consider the effects of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." *Diaz*, 577 F.3d at 504 (remanding where the ALJ acknowledged that claimant's obesity was a severe impairment at step two, but failed to consider its impact, in combination with claimant's other impairments, at step three "as required").

Ms. Moore stands about 5'6" and weighs approximately 400 pounds (in the course of the proceedings her weight fluctuated between 348 and 417) with a BMI of about 60,[1] which the National Institute of Health categorizes as Level III / "extreme obesity." *See* http://www.nhlbi.nih.gov/health/health-topics/topics/obe/diagnosis.html. Ms. Moore also complains of a number of other ailments that may stem from or be aggravated by her obesity, including "severe obstructive sleep apnea," arthritis, heel spurs, carpal tunnel syndrome, poor circulation and borderline intellectual functioning and migraine headaches. *See* AR at 17. The ALJ determined that all of these, except the arthritis and heel spurs, qualified as "severe impairments." *Id.*

---

[1]  Plaintiff's Brief supplies the following summary of Ms. Moore's obesity diagnosis:

> The record abounds with references to Ms. Moore's severe obesity. On January 17, 2007, Dr. Vora recorded Ms. Moore's weight of 413 pounds, with a BMI of 64 kg/m. On April 18, 2007, he confirmed his previous assessment noting that Ms. Moore needed profound weight reduction, since her BMI was still 64 kg/m. (Tr. 286, 292). Dr. Samia's consultative examination elicited the observation that Ms. Moore was morbidly obese, weighing approximately 380 pounds. (Tr. 252). Progress notes dated November 13, 2006 from WakeMed Health Services note Ms. Moore as being obese, weighing 408 pounds, with a BMI of 63. (Tr. 301). On March 18, 2007, Dr. Betty Franklin, M.A., and Craig Farmer, Ph.D noted that Ms. Moore was obese, and that she ambulated with difficulty. (Tr. 226-229). Nurse Felicia Briggs of the Orange Community Health Center confirmed the previous assessments concerning Ms. Moore's extreme obesity. Nurse Briggs noted that Ms. Moore was morbidly obese, with a BMI of 54, and that she weighed 356 pounds. (Tr. 405).

Brief of Plaintiff Betty Moore, ECF No. 15, at 18-19 ("Pl. Brief").

Despite the clear directives of SSR 02-1p and the Third Circuit, and despite the ALJ's own determination that Ms. Moore's morbid obesity is a "severe impairment," *see* AR at 16-17, the ALJ does not mention, let alone discuss, whether Ms. Moore's obesity, alone or in combination with her other impairments, meets or equals one of the listed impairments at step three of his analysis, as he was required to do. *See* 20 C.F.R. § 404.1520(c).

The Commissioner argues that "the ALJ properly and explicitly articulated his evaluation of plaintiff's obesity" in each step of his analysis, including at step three. *See* Defendant's Brief Pursuant to Local Civil Rule 9.1, ECF No. 16, July 23, 2012 ("Def. Brief"). This clearly is not so. The ALJ writes in his step three analysis that he has considered listing 3.10 (Sleep-related breathing disorders) which directs the evaluator to use the criteria under 3.09 (chronic cor pulmonale) or 12.02 (organic mental disorders), listing 4.11 (Chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system), and listing 12.05 (mental retardation). *See* 20 CFR PT. 404, Subpt. P, App. 1. The word "obesity" does not appear anywhere in the ALJ's step three analysis. *See* AR 17-18.

The Commissioner then suggests that, in any case, the ALJ's discussion of Ms. Moore's obesity at step four in his RFC determination, and the fact that he "explicitly noted that his decision included consideration of her obesity at every step of the sequential evaluation process" is sufficient to satisfy the requirements of SSR 02-1p and *Diaz*. *See* Def. Brief at 8. *Diaz* mandates, however, that "an ALJ must *meaningfully consider* the effects of a claimant's obesity, individually and in combination with her impairments, on her workplace function *at step three* and at every subsequent step." *Diaz*, 577 F.3d at 504 (emphasis added). *Diaz* also mandates that the ALJ engage the evidence and "clearly set forth the reasons for his decision" so that an appellate court can conduct "meaningful judicial review." *See id.* ("an ALJ must clearly set forth the reasons for his decision. Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient. The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review.") (citing *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000)). A blanket statement that an ALJ has considered evidence is not the same thing as an ALJ actually discussing the evidence and clearly setting forth the reasons for his decision as *Diaz* and *Burnett* require.

Finally, as discussed below, the ALJ's failure to consider Ms. Moore's obesity at step three was not only problematic with regard to his analysis of the severity of her physical impairments; it also adversely affected the ALJ's assessment of the severity of Ms. Moore's intellectual impairments.

### B. Evidence of Ms. Moore's Intellectual Disability

Intellectual Disability or "Mental Retardation" is a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. If an individual's

6

impairments, alone or in combination, meet or equal the severity of that "listing," a finding of disability is required, and the inquiry ends. *See Markle v. Barnhart*, 324 F.3d 182, 184-85 (3d Cir. 2003). The listing for "Mental Retardation," § 12.05, provides in relevant part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> Or
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of functioning;
>
> . . . .

20 CFR Part 404, Subpart P, Appendix 1, § 12.05

    1. *Evidence of significantly subaverage general intellectual functioning*

        a. <u>2005 Testing</u>

In February 2005, Ms. Moore was evaluated by a supervised neuropsychological consultant at the request of the North Carolina Disability Determination Center. *See* AR at 246-250 (Exhibit 2F). Ms. Moore was administered the Wechsler Adult Intelligence Scale – Third Edition ("WAIS III") with the following results: **Full scale IQ of 61; Verbal scale IQ of 60; Performance Scale IQ of 69**. *Id.* at 249. The neuropsychologist administering the test concluded that Ms. Moore:

> is currently functioning in the extremely low range of intelligence, overall. Her verbal and nonverbal skills fell in the extremely low range, and did not differ significantly from each other. Within the verbal domain, Ms. Moore scored in the extremely low to borderline range. She had significant difficulty with arithmetic and social reasoning. Within the nonverbal domain, her performance ranged from extremely low to

7

> borderline as well. She had significant difficulty with attention to detail.

*Id.*

A month later, in March 2005, a "Psychiatric Review Technique" form ("PRT") (SSA-2506-BK), and a "Mental Residual Functional Capacity Assessment" form ("MRFCA") (SSA-4734-FA-SUP), forms developed to track the mental impairments listings, were completed for Ms. Moore. *See* AR 259-272 (Exhibit 4F) and 273-276 (Exhibit 5F). Those forms indicate that Ms. Moore's medical disposition was based on listing 12.05; that she was diagnosed with Axis II: mild mental retardation; and that her functional limitations were mild to moderate. *See id.*

### b. 2007 Testing

In 2007, Ms. Moore was administered the WAIS III for a second time by Betty Franklin, M.A., a consultant for the North Carolina Department of Health and Human services. *See* AR at 321-323 (Exhibit 11F). Ms. Moore received the following scores: **Full Scale IQ of 52; Verbal Scale IQ of 55; Performance IQ of 58**. The examiner stated, however, that Ms. Moore seemed to be malingering at times, reporting: "It is somewhat unclear as to whether these scores reflect the claimant's true ability, as it did appear on occasion that the claimant was attempting to provide incorrect responses as well as not put forth her best effort." *Id.* at 322.

Despite her concern that Ms. Moore was not putting forth her best efforts, the examiner concluded: "The claimant does appear to have some significant medical problems at the present time, including sleep apnea, recently suffering a mild heart attack, and arthritis in both hands. The claimant . . . is quite obese, which is obviously contributing to her health issues. The claimant would more than likely require some assistance with administration of benefits if she were approved due to her limited level of intellectual functioning." *Id.* at 323.

Susan Killenberg, M.D., the consultant who completed the PRT and MRFCA forms based on the 2007 test results concluded: "Do not feel the current IQ scores are a valid representation of clmt's ability. Clmt noted to give limited effort during testing. Furthermore, clmt with prior work and SGA earnings in the fast food industry. Estimate true intelligence is in the borderline range. See MRFC." AR at 340 (Exhibit 13F). On the MRFCA, Dr. Killenberg noted that Ms. Moore has a "history suggestive of borderline intelligence," and that she "retains the mental capacity to perform SRRT's [simple, routine, repetitive tasks] in a low production, low stress, low social setting." *See* AR at 326 (Exhibit 12F).

### 2. *Evidence of deficits in adaptive functioning*[2]

During her 2005 evaluation, Ms. Moore's adaptive functioning was assessed using the Vineland Adaptive Functioning Scales ("VABS"),[3] an assessment tool designed to be administered to a parent/caregiver or teacher who can answer questions about the claimant's personal and social skills.[4] A friend, Laticia Andesar, accompanied Ms. Moore to the assessment and provided information for the VABS. *See* AR at 250 (Exhibit 2F). The evaluator determined that Ms. Moore's adaptive skills were "low in the areas of Communication and Daily Living Skills and moderately low in the area of Socialization." *See* AR at 250. Ms. Moore was diagnosed as mildly mentally retarded. The examiner concluded that "she would likely be unable to tolerate

---

[2] "Federal courts have defined adaptive functioning as 'how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.' The [American Association of Intellectual and Developmental Disabilities ] defines adaptive behavior as 'the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.' To qualify as [Intellectually Disabled ('ID')] an [individual] must exhibit significant deficits in one of these three areas. Under the DSM-IV, there are 11 domains of adaptive functioning to be measured, deficits in two or more of these areas meets the definition for ID." John Matthew Fabian, Psy. D., J.D, ABPP, et. al., *Life, Death, and IQ: It's Much More Than Just A Score: Understanding and Utilizing Forensic Psychological and Neuropsychological Evaluations in Atkins Intellectual Disability/Mental Retardation Cases*, 59 Clev. St. L. Rev. 399, 420 (2011).

[3] According to its developer, the Vineland Scales assessment tool is designed to measure a person's adaptive level of functioning and to aid in diagnosing and classifying intellectual and developmental disabilities and other disorders, such as autism, Asperger Syndrome, and developmental delays. The content and scales are organized within a three domain structure: Communication, Daily Living, and Socialization. These correspond to the three broad domains of adaptive functioning recognized by the American Association of Intellectual and Developmental Disabilities: Conceptual, Practical, and Social. *See* http://psychcorp.pearsonassessments.com/HAIWEB/Cultures/en-us/Productdetail.htm?Pid=Vineland-II

[4] "Adaptive behavior rating scales require collateral informants to rate the individual's actual performance in their environment rather than their ability to perform certain behaviors. . . . It is necessary when possible to obtain multiple family members and/or significant others in the [claimant's] life as collateral informants to provide information as to adaptive skills. It is imperative for the expert to interview numerous potential informants in order to secure an informant who knows the [claimant] well, can rate his behavior across a period of time in multiple settings, and who can be objective without significant bias. . . ." *See* Fabian, *Life, Death, and IQ, supra* note 2.

9

the stress associated with day to day work activity, particularly if the work is full time." *Id.*

The 2007 assessment did not include a proper adaptive behavior evaluation because Ms. Moore attended the evaluation by herself. *See id.* at 312 ("The claimant did have to serve as the sole source of information as she came alone to the appointment."). As a result, Ms. Moore served as the only source of information about her daily functioning.[5] She reported that she:

> does not have a driver's license. She usually wakes up early but sits in her room. The claimant does not fix any meals for herself but instead relies on her mother to do this. The claimant says she does not do any housecleaning or laundry. She cannot stand for very long. She likes to fix hair, but was unable to pass school to do this for a career. The claimant states that she does not go outside at all and has no social activities and no friends.

*Id.* at 322.

The 2007 MRFCA indicates that, at some point, Dr. Killenberg communicated with Ms. Moore's mother. Killenberg's Assessment includes the following notation: "Mother reported ADL's limited primarily for medical reasons. When clmt has felt better in the past, clmt has been able to cook, shop, count change from a purchase. She has never driven and reading / writing skills are noted to be limited." *Id.* at 326.

3. *Evidence of onset before age 22*

In his decision, the ALJ noted that Ms. Moore "was not able to furnish any proof of onset prior to age 22. She claimed her special education records were lost in a fire." *See* AR at 18. While it is true that there is no documentary evidence that Ms. Moore's intellectual disability manifested itself before the age of 22, she maintains that she was in special education throughout high school but was "passed along," and that she cannot read, write, or do basic arithmetic. *Id.* at 20; *see also* Pl. Brief at 2-3. She tried to attend beauty school to become a hairdresser but she could not maintain the required C average because she could not write or take tests. *See id.* Her struggles in school are confirmed by her mother, *see* AR at 276, 326 and 340, her adult daughter, *see*

---

[5] The American Association on Intellectual & Developmental Disabilities warns that self-ratings should be used "with caution" because the respondent may have difficulty communicating, she may not understand her impairments, or she may try to minimize her impairments. *See id.* (*citing* User's Guide: Mental Retardation Definition, Classification and Systems of Supports 18 (American Association on Intellectual & Developmental Disabilities ed., 10th ed. 2007)).

10

*id.* at 206 and her friend who participated in the 2005 VABS assessment, *see id.* at 250.

There is no confirmation of Ms. Moore's story that her school records were lost in a fire. It is clear, however, that her school records are unavailable, for whatever reason. That is confirmed by Ms. Moore's mother and the SSA consultants, who completed her evaluations and made several attempts to locate her school records in the process. *See, e.g.,* AR at 276 (2005 MRFCA) ("Attempted call to school district have revealed no results" and "TC with claimant's mother. She stated that she was in special education classes in school and that she had trouble reading. She stated that she does not have any school records in her home."); AR at 340 (2007 PRT) ("Unable to get school records. Two requests sent.").

### 4. *Whether Ms. Moore's impairments meet the required level of severity*

At step three of his analysis, the ALJ considered listing § 12.05 for Mental Retardation and discussed whether Ms. Moore's impairments met the severity requirements in Paragraphs A,B,C, or D of the listing. *See* AR at 17-19; *see also* 20 CFR Part 404, Subpart P, Appendix 1, § 12.05 (discussed *supra* § III.B.). Paragraphs B and C are most relevant here. To meet the severity requirements of §12.05(B), a claimant must have "[a] valid verbal, performance, or full scale IQ of 59 or less." *Id.* To meet the severity requirements of § 12.05(C), a claimant must have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of functioning." *Id.*

While first acknowledging that Ms. Moore has IQ scores in the required range for both §12.05B and 12.05C, the ALJ disregarded these scores "because the claimant was not putting forth her best effort on the examination." He reasoned as follows:

> Turning to the requirements in paragraph B, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less. The claimant has IQ scores in this range, but they were not deemed to be valid because the claimant was not putting forth her best effort on the examination (Exhibit 11F). Furthermore, the claimant was not able to furnish any proof of onset prior to age 22. She claimed her special education records were lost in a fire.
>
> In terms of the requirement in paragraph C, they are not met because the claimant does not have a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of

11

function. The claimant has IQ scores in this range, but they were not deemed valid because the claimant was not putting forth her best effort on the examination (Exhibit 11F). It was estimated that she is functioning in the borderline level of intellectual functioning (Exhibit 12F).

Inexplicably, the ALJ dismissed *both* the 2005 and 2007 scores because of the indications that Ms. Moore malingered during the 2007 assessment. To be clear, there is no evidence in the Record that Ms. Moore's 2005 IQ scores are invalid, or that she malingered in any way.[6] The ALJ's statement that "the claimant has IQ scores in [the 60-70] range, but they were not deemed to be valid because the claimant was not putting forth her best effort on the examination (Exhibit 11F)"[7] is oversimplified and imprecise. Ms. Moore's 2005 IQ scores—Full scale IQ of 61; Verbal scale IQ of 60; Performance Scale IQ of 69—fall squarely within the range of §12:05(C), and, as discussed above, there is ample evidence that Ms. Moore suffers from physical impairments that impose "an additional and significant work-related limitation of functioning" thus potentially qualifying Ms. Moore as disabled pursuant to listing § 12.05(C). In short, even disregarding the lower IQ scores from the 2007 evaluation, the 2005 scores, in combination with Ms. Moore's severe obesity and its associated health problems such as sleep apnea, may qualify as a *per se* disability under §12.05C.

Moreover, the ALJ's basis for discounting entirely Ms. Moore's 2007 IQ scores without further inquiry seems over-reliant on his general suspicions. Franklin, the 2007 evaluator, stated only that "it is *somewhat unclear* as to whether these scores reflect the claimant's true ability, as it did appear *on occasion* that the claimant was attempting to provide incorrect responses as well as not put forth her best effort." AR at 322 (emphasis added). She did not make a conclusive finding that Ms. Moore malingered, nor did she specify on which segment or segments of the test might have been affected. Section 12.05(B) requires that a claimant have "[a] valid verbal, performance, *or* full scale IQ of 59 or less." (emphasis added). Thus, even if *one* of Ms. Moore's 2007 scores was valid, it could qualify under paragraph B.

---

[6] The 2005 Evaluation Report states: "Information in this evaluation was obtained from an interview with Betty Moore, and Laticia Andesar, her friend, as well as information obtained by the Disability Determination Services. Information was also obtained from the administration and interpretation of the WAIS-III, the Vineland Adaptive Behavior Scales, and the House-Tree-Person Projective Drawing Test. The information appears to be of adequate reliability." AR at 248.

[7] The ALJ's citation is incorrect. Exhibit 11F contains documentation of Ms. Moore's 2007 evaluation. The documentation of her 2005 evaluation is contained in Exhibits 2F, 4F, and 5F. *Compare* AR at 246-276 with AR 320-341. This tends to suggest further that the ALJ simply conflated the 2005 and 2007 tests.

12

Second, as the Social Security Administration acknowledges in its Ruling 02-1p, an individual who is suffering from fatigue due to obesity-related sleep apnea may lack mental clarity during the day. *See* SSR 02-1p ("The effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions that may result from obesity-related sleep apnea."). Common sense indicates that "loss of mental clarity and slowed reactions" could affect one's performance, and the appearance of one's performance, on an IQ test.

Third, a proper adaptive functioning analysis was not performed as part of the 2007 evaluation. The Vineland Adaptive Behavior Scales are administered to a parent/caregiver or teacher who can answer questions about the claimant's personal and social skills. Because Ms. Moore attended the 2007 evaluation by herself, a complete adaptive behavior evaluation could not be administered.

Nonetheless, the record does contain substantial anecdotal evidence of Ms. Moore's adaptive functioning limitations, evidence that was largely passed over by the ALJ at step three of his analysis. By definition, mental retardation / intellectual disability requires *deficits* or *limitations* in adaptive function. *See* 20 CFR Part 404, Subpart P, Appendix 1, § 12.05 ("Mental retardation refers to significantly subaverage general intellectual functioning with *deficits in adaptive functioning* initially manifested during the developmental period.) (emphasis added); www.aaidd.org ("intellectual disability is a disability characterized by *significant limitations* both in intellectual functioning and in *adaptive behavior*, which covers many everyday social and practical skills.) (emphasis added). Rather than accounting for Ms. Moore's limitations in daily living, however, the ALJ focused on Ms. Moore's abilities—on what she *can do,* not on what she *cannot do.* For example, at step three of his analysis, the ALJ notes, "In activities of daily living, the claimant has mild restriction. The claimant cooks and does dishes." AR at 18. He concludes that her participation in an "adult daycare program" amounts to "socialization" despite Ms. Moore's testimony that she speaks only when spoken to and "socializes" only with her adult daughter and roommate. *See* AR at 20; 44-47; 52-54.

Ms. Moore, her mother, her daughter and her friend all report that Ms. Moore has severe limitations in her daily living skills. They report that she rarely does house chores; she does not do laundry; she does not go shopping; she rarely leaves the apartment by herself; she does not drive; she needs help to read and write; she has trouble with memory and instructions. *See id.* and 203-210, 250, 322. She cannot count change. *See* AR at 35. She does not watch television because she falls asleep. *Id.* at 44; 52-53. She cannot use public transportation by herself; her daycare program provides transportation to her appointments. *See id.* at 45-46. Some of these daily living limitations may be caused by or aggravated by Ms. Moore's physical health problems. That, however, is precisely why the SSA has instructed that "obesity that is 'severe,' . . . satisfies the criteria in listing 12.05C for a physical impairment

imposing an additional and significant work-related limitation of function." SSR 02-1p.

Finally, despite concerns that Ms. Moore was malingering, the 2007 evaluators still concluded, as did the evaluators in 2005, that Ms. Moore has borderline intellectual functioning. *See* AR at 323 ("limited level of intellectual functioning); *Id.* at 326 ("history suggestive of borderline intelligence"); *Id.* at 329 ("est. borderline IQ").

The ALJ's failure to consider the 2005 IQ scores, even if it was a mistake or an oversight, caused him to disregard substantial and highly relevant evidence. Given the deficiencies in the 2007 evaluation, the evidence produced during the 2005 evaluation and the substantial evidence of Ms. Moore's limitations in adaptive functioning, the ALJ, if he remained in doubt, could have requested that another WAIS III and VABS be administered in order to complete and clarify the Record. *See, e.g., Markle*, 324 F.3d at 189 (noting both the agency's expertise and first-hand knowledge of the record, as well as its ability to expand the record if needed, as the bases for requiring remand) (citing *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation")). I do not suggest that the ALJ was required to do so, or even that he should have done so; I mean only that, if he remained uncertain, that option was open.

Equally concerning is the absence of a reasoned explanation for significant parts of the ALJ's decision. The ALJ's failure to address the conflicting evidence regarding Ms. Moore's intellectual disability and the lack of an explanation as to why her 2005 IQ scores and ample evidence of adaptive functioning deficits and physical impairments should be disregarded at step three of the analysis, even standing alone, would be grounds for remand. *See Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided."); *Burnett*, 220 F.3d at 119 (3d Cir. 2000) (stating "this Court requires the ALJ to set forth the reasons for his decision" and remanding because "the ALJ merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment, without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning") (citing *Clifton v. Chater*, 79 F.3d 1007 (10th Cir.1996); *Logan v. Astrue*, CIV.A. 07-1472, 2008 WL 4279820 (W.D. Pa. Sept. 16, 2008) ("an ALJ may not capriciously disregard competent medical evidence, however, an ALJ is permitted to discredit medical evidence that conflicts with other evidence in the record, provided that the ALJ provides his or her reasons for doing so").

### C. Whether the ALJ failed to properly evaluate Ms. Moore's credibility

It is clear from the ALJ's decision that he was swayed by his perception that "the claimant lacks credibility on several key issues." On that score, the ALJ cited Ms. Moore's alleged malingering, a lack of treatment notes to support her physical complaints, and statements about her work history that proved to be untrue.[8] *See* AR 16-17, 21-22. The ALJ concluded:

> Credibility is a major factor in this case. The claimant alleged she did not work in 2008, even though her earnings record shows that she did. She then changed her story to having worked for five months at Checkers fast food restaurant. The claimant testified that she was taken off of food stamps because the public assistance worker told her she was making money. The consultative examiner thought the claimant was not putting forth her best effort on the IQ test. The claimant claims to have severe arthritis in her knees, but there are no records of this. Finally, the claimant alleges disability due to heel spurs, but the medical record of this condition consists of three prescription notes for relatively conservative and recent treatment.

*Id.* at 22.

An ALJ's credibility determination is entitled to substantial deference on appeal. *See Izzo v. Comm'r of Soc. Sec.*, 186 F. App'x 280, 286 (3d Cir. 2006) (not precedential) ("[A] reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision."). And it is Plaintiff's burden to establish that her subjective complaints are substantiated by medical evidence. *Pearson v. Barnhart*, 380 F. Supp. 2d 496, 508 (D.N.J. 2005). However, here it appears that the ALJ's credibility determination was tainted by his failure to consider substantial evidence of disability, and that in any event there does not remain a "sufficient basis for the ALJ's decision."

With regard to Ms. Moore's IQ scores, the severity of her intellectual disability, and her inability to explain her 2008 earnings, it is possible to posit that she was malingering and fabricating, but it is also true that an individual with borderline intellectual functioning aggravated by fatigue, depression and stress may contradict herself, may not appear to put forth her "best effort," and

---

[8] The record indicates that Ms. Moore also had $9,697 in self-employment earnings in 2008 that she was not able to explain. The ALJ surmised, based on no evidence, that the earnings could be the result of "tax fraud through use of the Earned Income Tax Credit," but noted that "there are no tax returns to evaluate in this case and there is no other evidence of tax fraud identifiable in the record." AR at 16-17.

15

may not be capable of sufficiently explaining discrepancies in the Record. Even if the 2007 IQ scores are deemed invalid, the the 2005 scores remain, and the ALJ failed to adequately explain his reasoning for rejecting them as substantial evidence of intellectual disability. The ALJ's conclusion that there is no evidence of intellectual disability manifesting itself before age 22 is intertwined with his skepticism that Ms. Moore's school records were lost in a fire. But if several highly functioning and resourceful SSA consultants cannot locate school records, it is very likely that they have indeed been lost or destroyed. Whether the cause was a fire is wholly immaterial.

With regard to Plaintiff's physical limitations, the ALJ's failure to consider (or at least to explain his consideration of) Ms. Moore's severe obesity and other physical impairments, such as sleep apnea—impairments that are *substantiated by medical evidence*—cannot be justified by resort to the claimant's "lack of credibility."

While the ALJ is best positioned to judge a claimant's credibility and his familiarity with the record requires deference, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the Secretary's decision is not supported by substantial evidence." *Reefer*, 326 F.3d at 379. Here, the ALJ's disregard for Ms. Moore's 2005 IQ scores and severe obesity at step three of the evaluation, as well as the other factors noted above, call for a remand.

### IV.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is **VACATED** and the case is **REMANDED** for further findings. An appropriate order follows.

_____
KEVIN MCNULTY, U.S.D.J.

**Date: March 8, 2013**